**TAX COURT OF NEW JERSEY**

JOSHUA D. NOVIN
Judge



Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

June 13, 2025

Robert P. Travers, Esq.
Robert P. Travers Law, LLC
8 Somerset Lane, Suite 100
Edgewater, New Jersey 07020

Lee Turner, Esq.
Florio Kenny Raval, L.L.P.
125 Chubb Avenue, Suite 310 N
Lyndhurst, New Jersey 07071

>    Re:    Aceks Property Management LLC v. Paterson City
>           Docket Nos. 010619-2022, 005959-2023, and 006309-2024

Dear Mr. Travers and Mr. Turner:

This letter shall constitute the court's opinion following trial of plaintiff, Aceks Property Management LLC's ("plaintiff"), challenge to the 2022, 2023, and 2024 tax year assessments on its improved property in Paterson City ("Paterson").

For the reasons stated herein, the court enters judgments reducing plaintiff's 2022, 2023, and 2024 tax year assessments.

## I.    Procedural History and Factual Findings

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony elicited during trial.

Plaintiff is the owner of the real property and improvements located at 50-72 Gray Street and 47-55 State Street, Paterson, New Jersey. The property is identified on Paterson's municipal tax map as block 6312, lots 1 and 2 (the "subject property").






As of each valuation date at issue, the subject property was owner-occupied and improved with two 4-story brick warehouse buildings, in average condition. The buildings were constructed circa 1900 and were initially operated as mill buildings. The buildings contain approximately 163,920 square feet of gross warehouse area. The first floor of the buildings contains approximately 41,520 square feet and the second, third, and fourth floors each contain approximately 40,800 square feet. The subject property's first, second, and third floors each have an 18' ceiling height, and the subject property's fourth floor has a 22' ceiling height. The buildings feature two freight elevators, two loading docks, three overhead doors, are fully sprinklered, and are heated by individual "gas fired unit heaters" suspended from the ceiling. The buildings have no air conditioning. The buildings have received a "Historic Preservation" designation, limiting changes to their exterior without the approval of Paterson's Historic Preservation Commission.

The subject property is in Paterson's Sandy Hill neighborhood, between 20th Avenue and 21st Avenue, with close access to Interstate Highway Route 80. The neighborhood surrounding the subject property consists of multi-family residential dwellings and small commercial/light industrial properties.

The property contains approximately 410 feet of frontage along Gray Street, 366 feet of frontage along State Street, and 203 feet of frontage along 21st Avenue. Collectively, the subject property's lots are rectangular-shaped and consist of approximately 1.83 acres. The topography of the property is level with Gray Street, State Street, and 21st Avenue. The site is serviced by public utilities, including municipal sewer and water. The subject property is in Special Flood Hazard Area Zone X, denoting an area of minimal flooding risk.

The subject property is in Paterson's I-1, Industrial zoning district, with permitted uses that include public recreation establishments, parks or playgrounds; governmental offices; trade






or technical schools; childcare centers; public utility facilities; business or professional offices; dry cleaning establishments and laundromats; wholesaling establishments; business services; research and development; off-street parking facilities serving the general public; warehousing and storage; light industrial use; overnight taxicab storage; and outdoor storage. However, the subject property's buildings exceed the current maximum building height permitted in Paterson's I-1, Industrial zoning district, thus, plaintiff's use of the subject property as a warehouse is a legal, non-conforming use.[1]

The subject property was acquired by plaintiff, under deed dated June 15, 2016, for reported consideration of $6,500,000. The deed was recorded in the Passaic County Register's Office in deed book 2849, page 33.

Plaintiff timely filed complaints challenging the subject property's 2022, 2023, and 2024 tax year assessments. During trial, plaintiff and Paterson each offered testimony from a New Jersey certified general real estate appraiser, who were accepted by the court, as experts in the real property valuation field (the "expert" or "experts"). The experts prepared appraisal reports expressing their opinions of the subject property's true market value as of the October 1, 2021, October 1, 2022, and October 1, 2023 valuation dates.

As of each valuation date the subject property's total tax assessments, Paterson's average ratio of assessed value to true value, the subject property's implied equalized value, and the experts' value conclusions are set forth below:

---

[1] Plaintiff's expert opined that the subject property's development is a "legally-permitted, conforming use." However, no evidence exists in the trial record disclosing whether plaintiff's expert evaluated the subject property's building height in Paterson's I-1, Industrial zoning district.






| Valuation date | Total tax assessments (lots 1 & 2) | Director's average ratio of assessed to true value | Implied equalized value | Plaintiff's expert's value conclusions | Paterson's expert's value conclusions[2] |
|---|---|---|---|---|---|
| 10/1/2021 | $13,783,565[3] | 67.98% | $19,352,110 | $7,330,000 | $13,963,000 |
| 10/1/2022 | $13,783,565 | 59.35% | $23,224,203 | $7,510,000 | $13,640,000 |
| 10/1/2023 | $13,783,565 | 51.20% | $26,921,025 | $7,740,000 | $13,299,000 |

## II. Conclusions of Law

### A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic, 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of a plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

---

[2] Paterson's expert's opined values of $13,963,000, $13,640,000, and $13,299,000 would warrant reductions in the subject property's tax assessments to $9,492,047, $8,095,340, and $6,809,088.

[3] Plaintiff's 2022 tax year complaint alleges that an added/omitted assessment was imposed on the subject property in the sum of $12,223,165, prorated for 12 months, resulting in a $13,155,565 total tax assessment. However, copies of the added/omitted assessments were not attached to the pleadings. Moreover, no evidence was introduced during trial regarding any 2022 tax year added/omitted assessments. In contrast, Paterson's expert testified that the subject property's total tax assessment was $13,783,565 for each of the 2022, 2023, and 2024 tax years.






In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the party challenging the tax assessments has overcome the presumption of validity. If the court concludes that the challenging party has not carried its burden, then dismissal of the action is warranted under R. 4:40-1, and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

Here, affording plaintiff all reasonable inferences that could be deduced from the evidence presented, the court finds that plaintiff produced cogent evidence sufficient to overcome the presumption of validity. The plaintiff's expert's opinions, if accepted by the court as true, raise debatable questions as to the validity of the subject property's tax assessments.

B.     Highest and Best Use

"For local property tax assessment purposes, property must be valued at its highest and






best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Determining the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd, 127 N.J. 290 (1992). The highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 268 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

Here, both experts concluded, and the court agrees, that the highest and best use of the subject property, as vacant, and as improved, is for industrial or light industrial/warehouse uses.

C. Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 1996), certif. denied, 168 N.J. 291 (2001)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)). See also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986).






Here, the subject property is owner-occupied and not income-producing. However, after considering all three approaches to value (sales comparison, income capitalization, and cost), both experts concluded that the income capitalization approach was the most appropriate method to derive an estimate of the subject property's true or market value. The court finds the experts' adopted methodology to be credible. Therefore, the court concludes that the income capitalization approach is the most appropriate method for deriving the subject property's true or market value.

      1.     <u>Income Capitalization Approach</u>

"The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." Appraisal Institute, <u>The Appraisal of Real Estate</u>, 439 (14th ed. 2013). <u>See</u> <u>Parkway Village Apartments Co.</u>, 8 N.J. Tax 430 (Tax 1985), <u>aff'd</u>, 9 N.J. Tax 199 (App. Div. 1986), <u>rev'd on other grounds</u>, 108 N.J. 266 (1987); <u>Helmsley v. Borough of Fort Lee</u>, 78 N.J. 200 (1978); <u>Hull Junction Holding Corp. v. Princeton Borough</u>, 16 N.J. Tax 68 (Tax 1996).

      A.     <u>Market or Economic Rent</u>

Central to the income capitalization approach is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" <u>Parkway Village Apartments Co.</u>, 108 N.J. at 270. The term market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, <u>The Dictionary of Real Estate Appraisal</u>, 121-22 (5th ed. 2010). The economic or market rent allows an appraiser to accurately forecast the stream of income to be generated by a property and to convert that future benefit into






a present value.

In conducting their analysis, both plaintiff's expert and Paterson's expert first identified the subject property's market area. The plaintiff's expert characterized that market area as the northern New Jersey industrial/warehouse market, presenting comparable leases from Passaic County to Bergen County. In contrast, Paterson's expert presented a more focused market area, presenting comparable leases only in Paterson's light manufacturing/industrial/warehouse market.

1. Plaintiff's expert

According to plaintiff's expert, properties like the subject property are typically leased on a modified gross lease basis. Thus, in his opinion, the subject property should be analyzed and valued on a modified gross lease basis. However, to corroborate his value conclusions, the plaintiff's expert also analyzed the subject property under a net lease basis. To determine the economic or market rents, plaintiff's expert identified eighteen (18) modified gross warehouse comparable leases and seven (7) net warehouse comparable leases.

In plaintiff's expert's opinion each of the subject property's four floors would garner a different economic or market rent, per square foot. Therefore, plaintiff's expert grouped his warehouse comparable leases into three (3) separate categories: (i) leases comparable to the subject property's ground floor/first floor; (ii) leases comparable to the subject property's second floor; and (iii) leases comparable to the subject property's third floor. Although the subject property comprises four floors, plaintiff's expert did not identify any comparable leases for the subject property's fourth floor. Rather, to arrive at the market or economic rent for the subject property's fourth floor, plaintiff's expert applied a 65% discount to his concluded first floor/ground floor economic or market rent.



a. First floor/ground floor

For the subject property's first floor/ground floor, plaintiff's expert identified five modified gross warehouse comparable leases (categorized in his appraisal report as comparable leases 1 to 5) and three net warehouse comparable leases (categorized in his appraisal report as comparable leases 19 to 21).

Modified gross comparable leases 1 to 5 were for warehouse space in 35-98 Eight Street, Passaic, New Jersey ("35-98 Eighth Street"), a building located in a 390,312 square foot industrial complex. The building at 35-98 Eighth Street was constructed in 1925 and has a 14' ceiling height. Net comparable leases 19 to 21 were for warehouse space in 450 Murray Hill Parkway, East Rutherford, New Jersey ("450 Murray Hill Parkway"), a building located in a 341,689 square foot industrial complex. The building at 450 Murray Hill Parkway was constructed in 1972 and has a 13' ceiling height. According to plaintiff's expert, modified gross comparable leases 1 to 5, and net comparable leases 19 to 21 were located on the ground floor of their respective buildings.

Modified gross comparable leases 1 to 5 consisted of leased areas of 3,098 to 5,302 square feet, bore lease commencement dates between January 2018 and January 2021, were for lease terms of two to four years, and had unadjusted effective rents ranging from $9.39 to $10.38 per square foot. The plaintiff's expert applied no adjustments to modified gross comparable leases 1 to 5.

Net comparable leases 19 to 21 consisted of leased areas ranging from 6,682 to 29,137 square feet, bore lease commencement dates between October 2017 and February 2021, were for terms of four to five years, and had unadjusted effective rents ranging from $8.24 to $9.27 per square foot. However, because comparable leases 19 to 21 were net leases, plaintiff's expert applied a downward 15% adjustment to net comparable leases 19 to 21 to account for his






estimation of the operating expenses that would be paid by the tenant. In addition, plaintiff's expert applied a downward 15% adjustment to account for the alleged superior location of net comparable leases 19 to 21. After applying the adjustments, the range of rents for net comparable leases 19 to 21 was $5.77 to $6.49 per square foot.

After reviewing the modified gross leases and net leases, plaintiff's expert concluded an economic or market rent for the subject property's first floor/ground floor of: (i) $10.00 per square foot, on a modified gross basis; and (ii) $6.00 per square foot, on a net lease basis. Plaintiff's expert applied his concluded economic or market rent to the subject property's 41,520 square feet of first floor/ground floor warehouse area.

b. Second floor

For the subject property's second floor, plaintiff's expert identified eight (8) modified gross warehouse comparable leases (categorized in his appraisal report as comparable leases 6 to 13) and four (4) net warehouse comparable leases (categorized in his appraisal report as comparable leases 22 to 25).

Modified gross comparable leases 6 to 13 were also located in 35-98 Eighth Street. Net comparable leases 22 to 25 were also located in 450 Murray Hill Parkway. According to plaintiff's expert, modified gross comparable leases 6 to 13, and net comparable leases 22 to 25 were located on the second floor of their respective buildings.

Modified gross comparable leases 6 to 13 consisted of leased areas from 1,087 to 8,558 square feet, bore lease commencement dates between January 2019 and April 2021, were for lease terms of two to three years, and had unadjusted effective rents ranging from $5.70 to $8.40 per square foot. Plaintiff's expert applied no adjustments to modified gross comparable leases 6 to 13.

Net comparable leases 22 to 25 consisted of leased areas ranging from 34,134 to 38,125






square feet, bore lease commencement dates between July 2017 and July 2020, were for terms of three to four years, and had unadjusted effective rents ranging from $4.35 to $4.89 per square foot. However, because comparable leases 22 to 25 were net leases, plaintiff's expert applied a downward 15% adjustment to net comparable leases 22 to 25 to account for their superior operating expense type. In addition, plaintiff's expert applied a downward 15% adjustment to account for the alleged superior location of net comparable leases 22 to 25. After applying the adjustments, the range of rents for net comparable leases 12 to 25 was $3.05 to $3.42 per square foot.

After reviewing the modified gross leases and net leases, plaintiff's expert concluded an economic or market rent for the subject property's second floor of: (i) $7.50 per square foot, on a modified gross basis; and (ii) $4.50 per square foot, on a net lease basis. Plaintiff's expert applied his concluded economic or market rent to the subject property's 40,800 square feet of second floor warehouse area.

     c.    Third floor

For the subject property's third floor, plaintiff's expert identified five (5) modified gross warehouse comparable leases (categorized in his appraisal report as comparable leases 14 to 18). Plaintiff's expert did not identify any net warehouse comparable leases for the subject property's third floor.

Modified gross comparable leases 14 to 18 were also located in 35-98 Eighth Street. According to plaintiff's expert, modified gross comparable leases 14 to 18 were located on the third floor of 35-98 Eighth Street.

Modified gross comparable leases 14 to 18 consisted of leased areas from 2,340 to 6,579 square feet, bore lease commencement dates between August 2017 and November 2020, were for





lease terms of one to five years, and had unadjusted effective rents ranging from $2.79 to $4.81 per square foot. Plaintiff's expert applied no adjustments to modified gross comparable leases 14 to 18.

After reviewing modified gross comparable leases 14 to 18, plaintiff's expert concluded an economic or market rent of: (i) $4.50 per square foot, on a modified gross basis; and (ii) $2.70 per square foot, on a net lease basis, for the subject property's third floor by seemingly applying a 55% discount to his concluded $6.00 per square foot modified gross lease economic or market rent to the subject property's ground floor/first floor. Plaintiff's expert applied his concluded economic or market rent to the subject property's 40,800 square feet of third floor warehouse area.

### d. Fourth floor

As stated above, plaintiff's expert did not identify any modified gross warehouse comparable leases or any net warehouse comparable leases for the subject property's fourth floor. Rather, he derived his concluded economic or market rent for the subject property's fourth floor by seemingly applying a 65% discount to his concluded economic or market rents for the subject property's ground floor/first floor. Thus, he concluded an economic or market rent of $3.50 per square foot, on a modified gross basis ($10.00 - $6.50 = $3.50), and an economic or market rent of $2.10 per square foot, on a net basis ($6.00 - $3.90 = $2.10).

### 2. Paterson's expert

In contrast to plaintiff's expert, Paterson's expert opined that most warehouse properties are leased on a net lease basis. Thus, Paterson's expert's income capitalization analysis was premised on net leases. In Paterson's expert's opinion, first floor/ground floor warehouse space generally lease at a higher rental rate in the market than do second, third, or fourth floor warehouse spaces. However, according to Paterson's expert, he could not discern any difference in the market






among the rental rates on the upper floors of a warehouse, especially when a property has freight elevators like the subject property. Therefore, Paterson's expert attributed one economic or market rent to the subject property's 41,520 square feet of first floor/ground floor warehouse space and attributed one economic or market rent to the subject property's 122,400 square feet of second, third, and fourth floor warehouse space.

To determine the subject property's economic or market rents, Paterson's expert identified six (6) modified gross warehouse comparable leases and eight (8) net warehouse comparable leases. None of Paterson's expert's warehouse comparable leases were in the same building, rather they were each located in different buildings and in different areas of Paterson.

The comparable leases consisted of leased areas ranging from 3,100 to 23,152 square feet, bore lease commencement dates between November 2016 and August 2023, were for lease terms of six months to seven years, and bore unadjusted effective rents ranging from $4.37 to $11.49 per square foot. According to Paterson's expert, comparable leases 4, 5, 9, 10, and 11, were located on the upper floors of their respective buildings.[4]

Paterson's expert then applied several adjustments to his warehouse comparable leases. In Paterson's expert's opinion, the rental market for warehouse space was "flat" or stable between 2016 to 2020, increased at a rate of 6% per year between 2021 to 2022, and was "flat" or stable again in 2023. Thus, Paterson's expert applied an upwards 6%-time adjustment to comparable leases 1, 2, 3, 4, 5, 6, and 7; an upwards 3.5%-time adjustment to comparable leases 8 and 9; an upwards 1.5%-time adjustment to comparable lease 10; and an upwards 0.5%-time adjustment to comparable lease 11.

---

[4] However, effective cross-examination later disclosed that some of his disclosed floor locations were likely inaccurate.

  

Paterson's expert also viewed the subject property as one warehouse comprising 163,920 square feet. Thus, in his opinion, an inverse relationship exists between rental area and unit price, with smaller warehouse spaces renting at higher prices and larger warehouse spaces renting at lower prices. Accordingly, Paterson's expert applied a downward 5%-size adjustment to comparable leases 1, 2, 3, 6, 7, 9, and 10; and a downward 10%-size adjustment to comparable leases 4, 5, 8, 11, 12, 13, and 14, to account for the subject property's larger size.

Further, Paterson's expert expressed that, in his opinion, comparable lease 1 was superior in quality to the subject property. Therefore, he applied a downward 5%-quality adjustment.

Finally, Paterson's expert applied an upwards 25%-adjustment to comparable leases 1, 2, 4, 6, 11, and 14, due to their modified gross lease type, to account for the expenses which he estimated would be borne by a tenant under a net lease structure.

After applying the above-referenced adjustments, the range of adjusted rents for Paterson's expert's comparable leases was $4.21 to $10.34 per square foot. Paterson's expert concluded an economic or market rent of: (i) $6.50 per square foot on a net basis, as of October 1, 2021, for the subject property's first floor/ground floor; (ii) $7.00 per square foot on a net basis, as of October 1, 2022 and October 1, 2023, for the subject property's first floor/ground floor; (iii) $5.00 per square foot on a net basis, as of October 1, 2021, for the subject property's second, third, and fourth floors; and (iv) $5.50 per square foot on a net basis, as of October 1, 2022 and October 1, 2023, for the subject property's second, third, and fourth floors.

3.    Analysis

At the outset, the court highlights that the plaintiff's expert's direct examination testimony comprised 19 minutes (which includes time for the court to make its finding that the plaintiff's appraiser was qualified as a property valuation expert). Moreover, Paterson's cross-examination






of the plaintiff's expert comprised 15 minutes. After direct examination and cross-examination were concluded, the court conducted questioning of plaintiff's expert, which comprised an additional 19 minutes. The court emphasizes the time devoted to direct testimony not to raise issues regarding the plaintiff's expert's qualifications, but rather to highlight that the plaintiff's trial record in this matter was rather scant. In contrast, Paterson's expert's direct examination testimony comprised 54 minutes and cross-examination comprised 46 minutes. Thus, most of the detailed information set forth above regarding the subject property and the comparable leases was discerned from the court's reading of plaintiff's expert's appraisal report, which was admitted into evidence during trial, or from Paterson's expert's testimony.

Here, the evidence presented during trial demonstrated that eighteen (18) of the twenty-five (25) comparable leases offered by the plaintiff's expert were modified gross leases, and that six (6) of the fourteen (14) comparable leases offered by Paterson's expert were modified gross leases.[5] Thus, twenty-four (24) of the thirty-nine (39) comparable leases presented to the court were modified gross leases. Based on a review of the comparable lease evidence, the court finds that there is no typical or prevailing lease type for warehouses in the Paterson market. The evidence undisputably disclosed that warehouses are leased, almost equally, on a net and modified gross basis. Rather, the type of leasing arrangement is seemingly influenced or shaped by several other factors including, the landlord, the tenant, the property configuration, and location.

Therefore, the court finds that the most effective and comprehensive manner to review and analyze the comparable lease evidence presented is to perform (as plaintiff's expert did), two

---

[5] A modified gross lease is a "lease in which the landlord receives stipulated rent and is obligated to pay some, but not all, of the property's operating and fixed expenses. Since assignment of expenses varies among modified gross leases, expense responsibility must always be specified." The Dictionary of Real Estate Appraisal at 127.






distinct income capitalization approach analyses, one employing the modified gross leases, and the other employing the net leases. This way the court can avoid the potential pitfalls associated with having to estimate and apply adjustments needed to convert modified gross leases into net leases.

### A. Modified gross comparable leases

Effective rent is an analytical tool employed by appraisers to account for, compare, and contrast lease terms, step-up provisions, and other financial concessions afforded under comparable leases in the marketplace, to assist the appraiser in developing credible economic or market rents. It is defined as "the total base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions – e.g. free rent, excessive tenant improvements, moving allowances, lease buyouts, cash allowances, and other leasing incentives." The Appraisal of Real Estate, 422 (15th ed. 2020).

Fundamental to an appraiser's determination of effective rent is the analysis, comparison, and contrast of leases and lease terms. A thorough review of lease agreements enables the appraiser to not only discern the base rent and lease type, but what, if any, periods of free rent, rent concessions, or other leasing incentives are being provided to tenants in the marketplace. Because "assignment of expenses varies among modified gross leases," it is incumbent upon an appraiser to clarify the tenant's "expense responsibility" by reviewing the lease agreement. The Dictionary of Real Estate Appraisal, at 127.

Here, in response to the court's questioning, plaintiff's expert admitted that he was in possession of only four (4) out of the eighteen (18) modified gross comparable leases identified under his appraisal report. Plaintiff's expert stated that he had copies of and reviewed only modified gross comparable leases 3, 4, 5, and 12. Thus, he derived the reported effective rents






under modified gross comparable leases 1, 2, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, and 18, and concluded that they were all substantially similar lease arrangements based only on his review of rent rolls furnished by the building owner during discovery in an unrelated local property tax appeal matter.

Without reviewing and having obtained a thorough understanding of the lease provisions and lease type, and whether the identified leases contain substantially similar rental terms or provisions, an appraiser cannot accurately render an informed opinion of effective rent. For example, if a lease agreement provided a tenant with a two-month period of free rent in March and April, but the October 1st rent roll reflects only the monthly rent payable as of September or October, the rent roll may not accurately reflect the effective rent payable under the lease agreement. Thus, the failure of an appraiser to thoroughly review or verify the lease terms and provisions upon which his or her opinions of economic or market rent are based, render those conclusions or opinions of dubious value.

Further, effective rent "may be calculated in several different ways. It may be estimated based on rental income from existing leases at market rates and terms, or rental income from leases at market rates and terms, depending on the intended use of the appraisal." Appraisal Institute, The Appraisal of Real Estate, 422 (15th ed. 2020). Thus, an appraiser's acceptance and adoption of rent rolls as evidence of effective rent is potentially problematic because it presupposes that the individual or individuals preparing the rent roll not only understand how effective rent should be calculated, but that such understanding mirrors the appraisers understanding.

Accordingly, for the above-stated reasons, the court finds the effective rents reported under plaintiff's expert's modified gross comparable leases 1, 2, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, and 18, are not credible evidence of economic or market rent and will attribute no weight to them.






In addition, cross-examination of Paterson's expert revealed that he did not possess or review a copy of his modified gross comparable lease 4. Rather, the sole data source for Paterson's expert's modified gross comparable leases 4 was CoStar. As this court has previously observed, the CoStar website user agreement expressly states, "[y]ou acknowledge that the Product includes data sourced from various providers, . . . [the] Company has not necessarily reviewed any or all of the content from such providers, does not guarantee the accuracy of such content, and expressly disclaims responsibility for such content."[6] Thus, although CoStar can be a useful starting point for appraisers when trying to identify potentially comparable properties, it is incumbent on the appraiser to verify and obtain detailed reliable information about the reported lease.

Therefore, for substantially the same reasons as stated above, the court finds that Paterson's expert's modified gross comparable lease 4 is not credible evidence of economic or market rent and attributes no weight to it.

Moreover, the court does not find several of Paterson's expert's unit size adjustments to be credible. Although Paterson's expert offered testimony that, in his opinion, an inverse relationship exists between unit size and rent (the smaller the unit size the higher the rent), the court questions whether the applied size adjustments accurately and appropriately account for this inverse relationship and the material size deviations.

Here, each floor of the subject property contains between 40,800 to 41,520 square feet. In sharp contrast, Paterson's expert's first floor/ground floor modified gross comparable leases range in size from 8,718 to 23,152 square feet, or between 45% to 79% smaller than the first floor/ground floor of the subject property. According to Paterson's expert, "although the overall facility was

---

6  https://www.costar.com/about/termsofuse






163,000 square feet, about 40,000 square feet per floor, many of these large facilities, older facilities like this are multi-tenanted, so I was really looking at the floor size when comparing the square footage for adjustment." However, plaintiff's expert offered no further meaningful testimony, data, empirical evidence, or analysis demonstrating how he arrived at his downward 5% to 10% size adjustments, or that the 5% to 10% adjustment applied accurately accounted for these discrepancies.

Notably, the court's review and analysis of the evidence discloses that Paterson's expert's first floor/ground floor modified gross comparable leases 1, 2, and 6 comprise leased areas of 15,000 to 23,152 square feet and have rental values of $8.15 to $8.48 per square feet.[7] In sharp contrast, Paterson's expert's modified gross comparable lease 14, which comprises a leased area of 8,718 square feet, has a rental value of $10.32 per square foot. Thus, the rents under modified gross comparable leases 1, 2, and 6 were between 22% to 26% lower than the rent under comparable lease 14. Therefore, the court finds that Paterson's expert's size adjustments are not adequately supported by the market evidence. Accordingly, the court accords Paterson's expert's modified gross comparable lease 14 little weight.

Moreover, the court emphasizes that plaintiff's expert's first floor/ground floor modified gross comparable leases 3, 4, and 5, each suffer from a similar deficiency. Plaintiff's expert's modified gross comparable leases 3, 4, and 5 comprise leased areas of 3,290 to 5,320 square feet, or are between approximately 88% to 92% smaller than the subject property's ground floor/first floor. Thus, the court questions whether plaintiff's expert's ground floor/first floor modified gross comparable leases 3, 4, and 5 are comparable to the subject property and competitive with the

---

[7] Including upwards time adjustments.


Interpreter


ADA
Americans with
Disabilities Act

ENSURING
AN OPEN DOOR TO
JUSTICE



subject property in the marketplace. Accordingly, for the foregoing reasons, the court accords the plaintiff's expert's modified gross comparable leases 3, 4, and 5 little weight.

However, the court finds credible Paterson's expert's testimony that warehouse rents in the Paterson market were stable between 2016 to 2020, increased 6% per annum in 2021 and 2022, and remained stable from 2023 to 2024. Thus, the court accepts Paterson's expert's 6% upward time adjustment to modified gross comparable leases 1, 2, and 6. Moreover, the court's review of the photograph contained in Paterson's expert's appraisal report supports his conclusion that modified gross comparable lease 1 was in superior condition than the subject property. Accordingly, the court accepts his 5% downward quality condition adjustment.

Additionally, based on the court's review of the remaining upper floor modified gross comparable leases, the court finds Paterson's expert's opinion that the same economic or market rent should be ascribed to the subject property's second, third, and fourth floors to be credible. Therefore, the court will ascribe the same economic or market rent to the subject property's second, third, and fourth floors.

Accordingly, after analyzing and reviewing: (i) plaintiff's expert's first floor/ground floor modified gross comparable leases 3, 4, and 5; and (ii) Paterson's expert's first floor/ground floor modified gross comparable leases 1, 2, and 6, the court finds that, an economic or market rent of $9.75 per square foot, on a modified gross basis, should be ascribed to the subject property's first floor/ground floor warehouse area. The court will apply the $9.75 per square foot economic or market rent to the subject property's 41,520 square feet of first floor/ground floor warehouse area for the 2022, 2023, and 2024 tax years.

Moreover, after analyzing and reviewing: (i) plaintiff's expert's upper floor modified gross comparable lease 12; and (ii) Paterson's expert's upper floor modified gross comparable lease 11,






the court finds that, an economic or market rent of $7.50 per square foot, on a modified gross basis, should be ascribed to the subject property's upper floors. The court does not find that the evidence supports further reduced rents for the subject property's third and fourth floors. Therefore, the court will apply the $7.50 per square foot economic or market rent to the subject property's 122,400 square feet of second, third, and fourth floor warehouse area.

B.  Net comparable leases

In undertaking his net comparable lease analysis, plaintiff's expert's applied a "Location" adjustment of "-15%" and a "Age/Cond./Appeal" adjustment of "-15%" to net comparable leases 19 to 25. In total, the plaintiff's expert applied downward 30% adjustments to net comparable leases 19 to 25. However, in explaining the basis, reasoning, and detailing how he arrived at these adjustments, the plaintiff's expert offered only the following testimony:

> because they were net comps they had to be adjusted, so as you can see under the adjustment grid the magnitude of the adjustments shows a total adjustment of 30%. So, although we included these in the report as corroborative information, the adjustment process there [to the net leases] required 30% adjustments, whereas on a [modified] gross basis we had zero adjustments.

Moreover, during cross-examination, the plaintiff's expert candidly acknowledged that, "adjusting a gross lease to a net lease is very subjective, if we are adjusting it 30%, I would love to have ten . . . multi-level buildings with forty leases, but I don't, [so] I have to deal with what I have."

Further, in response to the court's questions asking the plaintiff's expert how he arrived at his downward 30% adjustment to net comparable leases 19 to 25, plaintiff's expert stated,

> those adjustments are based on my experience in this market and the observed condition of the building. To have a source to point to for these types of adjustments, it's just not there. It's based upon, in my opinion, the building in East Rutherford is going to command a






> higher rent than the City of Paterson, for a number of factors. And, as far as the condition, that's just an observed condition based upon my opinion, and the fact that it's a newer building compared to a building that's built the turn of the century, I think it makes common sense that an adjustment would be in order.

It is well-settled that adjustments must have a foundation obtained from data extracted from the marketplace, market-derived sources or objective data, and not be based on subjective observations and/or personal experiences. An appraiser's adjustments "must have a foundation obtained from the market. . . ." Greenblatt, 26 N.J. Tax at 55. "[T]he opinion of an expert depends upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Ibid. When an expert "offers an opinion without providing specific underlying reasons . . . he ceases to be an aid to the trier of fact." Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div. 1996), certif. denied, 145 N.J. 374 (1996).

The expert is required to "give the why and wherefore of his expert opinion, not just a mere conclusion." Ibid. When an expert's opinion lacks a reliable foundation, supported by facts and market data, "the court cannot extrapolate value." Inmar Associates v. Edison Twp., 2 N.J. Tax 59, 66 (Tax 1980). Thus, when an expert does not provide a sufficient explanation for his adjustments, rooted in fact and an analysis of market data, "the opinion of the expert is entitled to little weight in this regard." Dworman v. Tinton Falls, 1 N.J. Tax 445, 458 (Tax 1980) (citing to Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959), certif. denied, 30 N.J. 153 (1959)).

The plaintiff's expert failed to offer any meaningful evidence, data, or testimony to the court supporting the downward 30% location and age/condition/appeal adjustments to his net comparable leases 19 to 25. The plaintiff's expert candidly admitted that the adjustments were "subjective" and based on his personal observations. However, it is not the plaintiff's expert's


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



ability to recognize that adjustments were necessary, but rather, it is how the adjustments were calculated, consistent with a detailed analysis of the marketplace, that is important. Here, the plaintiff's expert did not furnish the court with any market derived evidence or detailed analysis supporting the location and age/condition/appeal adjustments that he applied. Thus, without an adequate understanding of the adjustments relationship to the marketplace, the court finds that plaintiff's expert's net comparable leases 19 to 25 are entitled no weight.

Moreover, although Paterson's expert's report stated that net comparable leases 9 and 10 were both fourth floor warehouse locations, cross-examination disclosed that Paterson's expert was not entirely certain of their leased location. The photographs included in Paterson's expert's appraisal report disclosed that net comparable lease 9 was in what appeared to be a two-story building with a potentially adjacent multi-floor building, and net comparable lease 10 was in what appeared to be a one or possibly two-story building. Thus, Paterson's expert was unsure what upper floors net comparable leases 9 and 10 were on.

In addition, further cross-examination of Paterson's expert revealed that he did not possess or review a copy of his net comparable lease 5. Rather, the sole data source for Paterson's expert's comparable lease 5 was CoStar. Accordingly, for substantially the same reasons expressed above, the court finds that Paterson's expert's net comparable lease 5 is not credible and attributes no weight to it.

Again, the court finds it important to highlight the square footage discrepancies which exist between the subject property and Paterson's expert's net comparable leases. Here, each floor of the subject property contains between 40,800 to 41,520 square feet. In sharp contrast, Paterson's expert's first floor/ground floor net comparable leases range in size from 3,100 to 25,505 square feet, or between 39% to 93% smaller than the first floor/ground floor of the subject property.






The court's review and analysis of the evidence further discloses that Paterson's expert's net comparable leases 3, 7, 9, and 10 comprise leased areas of 14,500 to 25,505 square feet and have rental values of $4.44 to $6.31 per square feet.[8]   In contrast, Paterson's expert's net comparable leases 8, 12, and 13 comprise leased areas of 3,100 to 6,400 square feet and have rental values of $8.96 to $11.49 per square foot.  Thus, the rents under Paterson's expert's net comparable leases 3, 7, 9, and 10 were between 30% to 61% lower than the rents under his net comparable leases 8, 12, and 13.  Thus, the court again questions the accuracy of Paterson's expert's 10% downward size adjustment.  Accordingly, for the foregoing reasons, the court accords Paterson's expert's net comparable leases 8, 12, and 13 little weight.

Accordingly, after analyzing and reviewing Paterson's expert's first floor/ground floor net comparable leases 3, 7, 8, 12, and 13, the court finds that an economic or market rent of $6.00 per square foot, on a net basis, should be ascribed to the subject property's first floor/ground floor warehouse area.[9]   The court will apply the $6.00 per square foot economic or market rent to the subject property's 41,520 square feet of ground floor/first floor warehouse area for the 2022, 2023, and 2024 tax years.

Moreover, after analyzing and reviewing Paterson's expert's upper floor net comparable leases 9 and 10, the court finds that an economic or market rent of $4.50 per square foot, on a net basis, should be ascribed to the subject property's upper floors.[10]   In addition, the court does not find that the evidence supports further reduced rents for the subject property's third and fourth

---

[8]  Inclusive of the upwards time adjustments.

[9]   The court places the greatest weight on Paterson's expert's first floor/ground floor net comparable leases 3 and 7, having adjusted rental values of $5.48 and $5.99 per square foot.

[10]  The court places the greatest weight on Paterson's expert's upper floor net comparable leases 9 and 10, having adjusted rental values of $4.21 and $5.94 per square foot.






floors. Therefore, the court will apply the $4.50 per square foot economic or market rent, on a net basis, to the subject property's 122,400 square feet of second, third, and fourth floor warehouse area.

### B. Vacancy and collection loss

Vacancy and collection losses are "usually estimated as a percentage of potential gross income, which varies depending on the type and characteristics of the physical property, the quality of its tenants, the type and level of income streams, current and projected market supply and demand conditions, and national, regional, and local economic conditions." Appraisal Institute, The Appraisal of Real Estate 478 (14th ed. 2013).

Here, in reaching the concluded vacancy and collection loss factor to be applied to the potential gross income under the reconstructed operating statements, both the plaintiff's expert and Paterson' expert analyzed published vacancy rates for industrial property. The plaintiff's expert testified that he reviewed vacancy rate data published by CoStar of the Paterson industrial submarket from 2015 to 2024. Paterson's expert testified that he reviewed vacancy rate data published by PwC of the National Warehouse Market for the 3rd Quarter 2021, 3rd Quarter 2022, and 3rd Quarter 2023.[11]

After reviewing that data and information, both experts concluded that a vacancy and collection loss factor of five (5%) percent of potential gross income was reasonable and applied that vacancy and collection loss factor to their reconstructed operating statements.

The court's review of the CoStar data discloses that vacancy rates in the Paterson industrial

---

[11] The Addendum to Paterson's expert's appraisal report contained only the PwC investor surveys for the "National Warehouse Market" for the 3rd Quarter 2021 and 3rd Quarter 2022. The PwC investor surveys for the 3rd Quarter 2023 were not included.





submarket were approximately: (i) 2% in the 3rd Quarter 2021; (ii) 2% in the 3rd Quarter 2022; and (iii) 3% in the 3rd Quarter 2023.  Additionally, the court's review of the PwC data discloses that vacancy rates in the National Warehouse market ranged from: (i) 0% to 6% in the 3rd Quarter 2021; and (ii)  0% to 6% in the 3rd Quarter 2022.[12]

The court finds that the evidence supports the experts' concluded vacancy and collection loss factor.  Accordingly, the court will apply a five (5%) percent vacancy and collection loss factor to the subject property's reconstructed gross potential income for all tax years at issue.

### C.    Operating expenses

The next step under the income capitalization approach is determination of the appropriate stabilized operating expenses.  Operating expenses are the "periodic expenditures necessary to maintain the real property and continue production of the effective gross income, assuming prudent and competent management."  The Appraisal of Real Estate, at 479.

Here, although plaintiff's expert testified that he found the modified gross lease structure most applicable to the subject property, he undertook a stabilized expense analysis on both a modified gross lease and net lease basis, to corroborate his findings.  In contrast, Paterson's expert found the net lease structure most applicable to the subject property and performed a stabilized expense analysis only on a net lease basis.

Under both the modified gross lease and net lease structures, a deduction for management fees, real estate commissions, and replacement reserves, as stabilized operating expenses, is generally applied.  However, under a modified gross lease structure, the property owner's stabilized expenses also include deductions for common area maintenance and insurance.  In these

---

[12]  No PwC Investor Survey data was provided by Paterson's expert for the 3rd Quarter 2023.





matters, plaintiff's expert did not include real estate commissions as a stabilized operating expense, however, Paterson's expert did. The court finds Paterson's expert explanation that warehouse properties in the Paterson warehouse and industrial market typically incur real estate commissions to procure tenants to be reasonable. Therefore, the court finds that it is appropriate to include real estate commissions as a stabilized operating expense.

Plaintiff's expert opined that: (i) a stabilized common area maintenance expense of $0.15 per square foot; (ii) a stabilized insurance expense of $0.85 per square foot; (iii) a stabilized management fee of 3% of effective gross income; and (iv) a stabilized replacement reserve expense of $0.35 per square foot should apply to the subject property. To ascertain these expense values, plaintiff's expert reviewed data published by PwC and reviewed the operating expenses of three other warehouse and industrial properties. Two of the comparable properties are in North Bergen (Hudson County), and one is in Mahwah (Bergen County).

The PwC Investor Survey data revealed that the average management fees in the National Warehouse, East Coast Region, ENC Region, and Pacific Region ranged from: (i) 2.40% to 2.50% of effective gross income, in the 1st Quarter 2021; (ii) 2.35% to 2.50% of effective gross income, in the 1st Quarter 2022; and (iii) 2.15% to 2.67% of effective gross income, in the 1st Quarter 2023. The PwC Investor Survey data further revealed that the average replacement reserve expense, per square foot, in the National Warehouse, East Coast Region, ENC Region, and Pacific Region ranged from: (i) $0.13 to $0.15, in the 1st Quarter 2021;[13] (ii) $0.11 to $0.15, in the 1st Quarter 2022; and (iii) $0.11 to $0.23, in the 1st Quarter 2023.

The three comparable properties bore common area maintenance charges ranging from

---

[13] Excluding the East Coast Region.





$0.02 to $0.40 per square foot and insurance expenses ranging from $0.29 to $1.40 per square foot.

In contrast, according to Paterson's expert, (i) a stabilized leasing commission expense of 3% of effective gross income; (ii) a stabilized management fee of 5% of effective gross income; and (iii) a stabilized replacement reserve expense of 2% of effective gross income should apply to the subject property. According to Paterson's expert, his concluded stabilized expenses were based on his examination of comparable properties in the Paterson market.

At the outset, the court finds plaintiff's expert's $0.15 common area maintenance expense and Paterson's expert's 5% management fee to be credible and supported in the trial record. The three comparable warehouse properties bore a median common area maintenance expense of $0.15 per square foot and mean of $0.18 per square foot. In addition, Paterson's expert offered credible testimony that a 5% management fee is typical for warehouses in the Paterson market. Therefore, the court will apply a stabilized management fee of 5% of effective gross income and a common area maintenance expense of $0.15 per square foot on the subject property's reconstructed operating statements.

In addition, Paterson's expert testified that he surveyed local commercial real estate brokers, finding that leasing commissions are generally 3% of the aggregate rent. Thus, Paterson's expert opined that a leasing commission expense of 3% of the subject property's effective gross income was reasonable. The court finds Paterson's expert's testimony on this issue to be credible and supported in the trial record. Therefore, the court will apply a stabilized leasing commission expense of 3% of effective gross income on the subject property's reconstructed operating statements.

The court's review of the PwC Investor Surveys further disclosed replacement reserves ranging from $0.11 to $0.23 per square foot, or $18,031 to $37,702 annually. Paterson's expert






similarly opined a replacement reserve expense of 2% of effective gross income, or approximately $15,198 to $25,134 annually.[14] However, plaintiff's expert opined that a replacement reserve expense of $0.35 per square foot, or $57,372 annually should apply. This represents approximately three times the $0.11 and $0.12 per square foot average of the PwC Investor Surveys for the East Region Warehouse markets. However, no meaningful testimony or evidence was offered by plaintiff's expert to support such a deviation in the replacement reserve expenses for the subject property. Rather, the court finds Paterson's expert's testimony on this issue to be more credible and supported in the trial record. Therefore, the court will apply a stabilized replacement reserve expense of 2% of effective gross income on the subject property's reconstructed operating statements.

Finally, the court's review of plaintiff' expert's comparable warehouse property data disclosed insurance expenses having a median value of $0.74 per square foot, and mean value of $0.71 per square foot. In contrast, the plaintiff's expert opined that an insurance expense of $0.85 per square foot should apply to the subject property. Again, plaintiff's expert offered no meaningful testimony explaining why the subject property would incur higher insurance expenses or why an insurance expense of approximately $0.11 to $0.14 more per square foot should apply to the subject property. Therefore, based on a review of the evidence, the court finds that a $0.71 stabilized insurance expense is reasonable and supported by the evidence. The court will apply the $0.71 per square foot stabilized insurance expense to the subject property's 163,920 square feet on the reconstructed operating statement.

---

[14] Based on the court's concluded effective gross income.






     D.    <u>Capitalization</u>

The direct capitalization technique is used "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." Appraisal Institute, <u>The Appraisal of Real Estate</u> 491 (14th ed 2013); <u>Prudential Ins. Co. of Am. v. Parsippany-Troy Hills Twp.</u>, 16 N.J. Tax 58, 60 (Tax 1995), <u>aff'd</u>, 16 N.J. Tax 148 (App. Div. 1996); <u>Hull Junction Holding Corp.</u>, 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's net operating income into an estimate of market value.

Here, in deriving their capitalization rates, plaintiff's expert and Paterson's expert reviewed published investor survey data to employ the band of investment technique. The investor surveys are completed by market participants and compiled by analytical firms and trade associations. This court has "sanctioned" the use of data collected and commercially published by analytical firms and trade associations, such as the American Council of Life Insurance ("ACLI"), PwC, and Real Estate Research Corporation ("RERC"). By scrutinizing and "analyzing this data, in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." <u>Hull Junction Holding</u>, 16 N.J. Tax. at 83.

The band of investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." <u>Id.</u> at 80-81 (quoting Appraisal Institute, <u>Appraisal of Real Estate</u>, 467 (10th ed 1992)). In employing the "[b]and of [i]nvestment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by






furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Id. at 82 (quoting Glen Wall Assocs., 99 N.J. at 279-80).

To perform his band of investment technique and discern his mortgage interest rates and dividend equity rates, plaintiff's expert reviewed: (i) PwC Real Estate Investor Survey capitalization rates as of October 1, 2021, October 1, 2022, and October 1, 2023; (ii) ACLI Investment Bulletins, Commercial Mortgage Commitments, for the 3rd Quarter 2021, the 3rd Quarter 2022, and the 3rd Quarter 2023; (iii) RERC's Regional Investment Criteria – Second Tier and Third Tier Investment Properties capitalization rates as of October 1, 2021, October 1, 2022, and October 1, 2023; and (iv) "Economic Indicators" for October 2021, October 2022, and October 2023, containing a variety of financial information including, the 3-Month and 6-Month U.S. Treasury Bill rates, LIBOR 3-month rates, U.S. 5-year, 10-year, and 30-year bond rates, municipal bond rates, and corporate bond rates.

Paterson's expert, in performing his band of investment technique, reviewed the ACLI Investment Bulletins, Commercial Mortgage Commitments, for the 3rd Quarter 2021, the 3rd Quarter 2022, and the 3rd Quarter 2023, to derive his mortgage interest rates, loan-to-value ratios, loan amortization terms, and equity dividend rates. In addition, Paterson's expert testified that he reviewed capitalization rate data published in PwC Investor Surveys for the National Warehouse Markets for the 3rd Quarter 2021, the 3rd Quarter 2022, and the 3rd Quarter 2023.

The following charts detail the individual components of the experts' band of investment analysis and their concluded base capitalization rates for each tax year involved herein:






| 2022 tax year | | | | | |
|---|---|---|---|---|---|
| | Interest rate | Loan-to-value ratio | Amortization period | Equity dividend rate | Base capitalization rate |
| plaintiff's expert | 3.75% | 65% | 25 years | 8% | 6.81%[15] |
| Paterson's expert | 2.9% | 60% | 30 years | 6% | 5.39%[16] |

| 2023 tax year | | | | | |
|---|---|---|---|---|---|
| | Interest rate | Loan-to-value ratio | Amortization period | Equity dividend rate | Base capitalization rate |
| plaintiff's expert | 4% | 65% | 25 years | 8% | 6.92%[17] |
| Paterson's expert | 4.9% | 55% | 30 years | 4.5% | 5.84%[18] |

| 2024 tax year | | | | | |
|---|---|---|---|---|---|
| | Interest rate | Loan-to-value ratio | Amortization period | Equity dividend rate | Base capitalization rate |
| plaintiff's expert | 4.25% | 65% | 25 years | 8% | 7.03%[19] |
| Paterson's expert | 5.9% | 55% | 35 years | 5% | 5.97%[20] |

The court's review and analysis of the ACLI Investment Bulletins PwC Investor Surveys and RERC data relied on by the plaintiff's expert and Paterson's expert, reveals the following range of interest rates, loan-to-value rates, and capitalization rates:

| | 3rd Quarter 2021 | 3rd Quarter 2022 | 3rd Quarter 2023 |
|---|---|---|---|
| ACLI Bulletins[21] | | | |
| Interest rates | 2.50% - 3.16% | 4.40% - 4.98% | 5.76% - 6.17% |
| Loan-to-value ratios | 45.17% - 59.06% | 52.93% - 55.20% | 56.11% - 60.49% |
| Capitalization rates | 4.12% - 5.96% | 4.48% - 5.55% | 5.04% - 6.51% |
| PwC | | | |
| Capitalization rates | 3% - 6.5% | 3% - 5.75% | 3% - 6.5% |
| Average | 4.43% | 4.29% | 4.97% |
| RERC | | | |
| Capitalization rates | 5.5% - 11% | 5.5% - 11% | 6.8% - 11% |
| Averages | 7.5% to 8.3% | 7.7% - 8.8% | 8.3% - 9.1% |

At the outset, the court emphasizes that the PwC Investor Surveys and RERC data reflects

---

[15]  Plaintiff's expert rounded his concluded capitalization rate to 7%.

[16]  Paterson's expert rounded his concluded capitalization rate to 5.4%.

[17]  Plaintiff's expert rounded his concluded capitalization rate to 7%.

[18]  Paterson's expert rounded his concluded capitalization rate to 5.85%.

[19]  Plaintiff's expert rounded his concluded capitalization rate to 7%.

[20]  Paterson's expert rounded his concluded capitalization rate to 6%.

[21]  The ACLI Investment Bulletins for: (i) Fixed Rate - Industrial; (ii) Fixed Rate Industrial – $5 Million - $14,999 million; (iii) Fixed Rate Industrial  - Mid-Atlantic regions; (iv) Fixed Rate Industrial – Mid Atlantic - New Jersey; and (v) Fixed Rate – Metropolitan NY-NJ-CT-PA.






a forecast of regional and institutional investors required or expected equity return on a 100% cash transaction.[22]    Stated differently, "[t]he RERC and [PwC] Korpacz data is based upon <u>all cash transactions</u>."    <u>Hull Junction Holding Corp.</u>, 16 N.J. Tax at 102 (emphasis added). However, the band of investment technique employs both a mortgage financing component, and a cash equity investment component.    Thus, as keenly observed by Judge Kuskin, "[w]here the cash investment, *i.e.,* the equity investment, is only 25%-30% of the total investment, the equity dividend rate would tend to be lower than the all[-]cash rate."  <u>Ibid.</u> (emphasis in original). Accordingly, the court finds that the equity dividend and capitalization rates reflected in the RERC and PwC Investor Surveys are not necessarily an accurate gauge of the equity dividend and capitalization rates that would be employed in a transaction that involves between 55% to 65% mortgage financing, as opined by the experts.

Additionally, the court emphasizes that RERC defines net operating income as the "current income of a property <u>net of all operating expenses</u>, but before any reserves, debt service, capital expenditures, tenant improvements and leasing commissions."[23](emphasis added).    Thus, in calculating the capitalization rates reported under the RERC surveys, a property's annual real estate taxes have been deducted from its gross income.  However, it is a well-settled principle of New Jersey local property tax valuation that "[i]nclusion of real estate taxes as an operating expense is not permitted because the amount of real estate taxes are ultimately determined as a result of this court's finding of value. . . ."  <u>Spiegel v. Town of Harrison</u>, 18 N.J. Tax 416, 427 (Tax 1999).  In sum, the court finds that the capitalization rates promulgated by RERC are not an accurate representation of capitalization rates that would be employed in New Jersey Tax Court

---

[22]  https://rerc.com/img/sample-realestate.pdf.
[23]  https://rerc.com/img/sample-realestate.pdf.






matters.

Therefore, for the above-stated reasons, the court places little weight on the PwC Investor Surveys and RERC data in determining the capitalization rates that should be applied to the subject property's reconstructed net operating income. Although RERC and the PwC Investor Surveys are a source of analytical data available for purchase in the marketplace, the court does not find that they should be the principal source of data for discerning the equity dividend and capitalization rates for the subject property. As recognized by The Appraisal of Real Estate, when developing a capitalization rate, published surveys are an adequate source of "support rather than as primary evidence of a capitalization rate." The Appraisal of Real Estate 466 (14th ed 2013).

Rather, the court finds that the ACLI Investment Bulletins provide more meaningful data and information because they are not polluted or impacted by questions of whether they represent all cash transactions, or how potential survey recipients perceived hypothetical transactional questions. Although not perfect, the ACLI Investment Bulletins provide national data on actual financing transactions, identifying the number of transactions in each category, the interest rates, the loan amortization periods, and the capitalization rates, to enable the court to discern a capitalization rate for the subject property under the band of investment technique.

However, the data under the ACLI Investment Bulletins generally reflect high-quality, investment-grade properties. In contrast, the subject property comprises 125-year-old former mill buildings, in average condition, that are not high-quality investment grade. Therefore, the court finds that the interest rates and capitalization rates for the subject property would fall at the top of or slightly above the value range reported under the ACLI Investment Bulletins.

Moreover, the court finds that the U.S. Bond and corporate bond yields also provide






meaningful examples of alternate, albeit conservative, investments and the anticipated cash-on-cash return that investors in the marketplace could have achieved at that time. Thus, the equity dividend rates for the subject property should also be measured against that information.

Accordingly, based on the court's review of the above data and information, and in consideration of both experts' testimony, the court finds that, as of the October 1, 2021 valuation date, a 3.50% mortgage interest rate is most credible, plaintiff's expert's 65% loan-to-value ratio is more credible, plaintiff's expert's twenty-five (25) year amortization period is more credible, and that a 7% equity dividend rate is most credible.[24] Thus, using the band of investment technique, the court finds that the base capitalization rate, as of the October 1, 2021 valuation date, is 6.36% (6.007% x 65% = 3.91% & 7% x 35% = 2.45%, 3.91% + 2.45% = 6.36%).

The court further finds that, as of the October 1, 2022 valuation date, a 5% mortgage interest rate is most credible, plaintiff's expert's 65% loan-to-value ratio is more credible, plaintiff's expert's twenty-five (25) year amortization period is more credible, and that a 6% equity dividend rate is most credible.[25] Thus, using the band of investment technique, the court finds that the base capitalization rate, as of the October 1, 2022 valuation date, is 6.66% (7.015 x 65% = 4.56% & 6% x 35% = 2.10%, 4.56% + 2.10% = 6.66%).

---

[24] The ACLI Bulletins reported average interest rates on 52 mortgage loans nationally having a value between $5 million and $14,999 million was 3.6%, with an average length of 12.7 years, and on 17 mortgage loans in the Mid-Atlantic region was 2.5%, with an average length of 12.8 years. Further, the reported range of loan-to-value ratios were 45.17% - 59.06%. Moreover, as of October 2021, the U.S. 30-year Bond bore a yield of 2.13% and corporate bonds having an "A" rating had an average yield of 2.88%.

[25] The ACLI Bulletins reported average interest rates on 31 mortgage loans nationally having a value between $5 million and $14,999 million was 4.93%, with an average length of 12.57 years and on 5 mortgage loans in the Mid-Atlantic region was 4.98%, with an average length of 17.61 years. Further, the reported range of loan-to-value ratios were 52.93% - 55.20%. Moreover, as of October 2022, the U.S. 30-year Bond bore a yield of 4.22%.






Finally, the court finds that, as of the October 1, 2023 valuation date, a 6% mortgage interest rate is most credible, plaintiff's expert's 65% loan-to-value ratio is more credible, plaintiff's expert's twenty-five (25) year amortization period is more credible, and that a 6% equity dividend rate is most credible.[26] Thus, using the band of investment technique, the court finds that the capitalization rate, as of the October 1, 2023 valuation date, is 7.13% (7.732 x 65% = 5.03% & 6% x 35% = 2.10%, 5.03% + 2.10% = 7.13%).

Accordingly, the subject property's reconstructed operating statements for the 2022, 2023, and 2024 tax years are set forth below:

| | Square feet | Economic rent | Total | Economic rent | Total |
|---|---|---|---|---|---|
| **2022 TAX YEAR** | | | | | |
| | | **Modified Gross Lease** | | **Net Lease** | |
| INCOME | | | | | |
| Ground/first floor | 41,520 | $9.75 P.S.F. | $404,820 | $6.00 | $249,120 |
| 2nd, 3rd, & 4th floors | 122,400 | $7.50 P.S.F. | $918,000 | $4.50 | $550,800 |
| POTENTIAL GROSS INCOME | | | $1,322,820 | | $799,920 |
| LESS: Vacancy & Collection Loss | | 5% | ($66,141) | 5% | ($39,996) |
| EFFECTIVE GROSS INCOME | | | $1,256,679 | | $759,924 |
| | | | | | |
| LESS: Operating Expenses | | PSF or % EGI | | PSF or % EGI | |
| Common Area Maintenance | | $0.15 | $24,588 | -- | -- |
| Insurance | | $0.71 | $116,383 | -- | -- |
| Management fee | | 5% | $62,834 | 5% | $37,996 |
| Leasing commissions | | 3% | $37,700 | 3% | $22,798 |
| Replacement Reserves | | 2% | $25,134 | 2% | $15,198 |
| | | | ($266,639) | | ($75,992) |
| | | | | | |
| NET OPERATING INCOME | | | $990,040 | | $683,932 |
| | | | | | |
| Base Capitalization Rate | | | 6.36% | | 6.36% |
| Effective Tax Rate | | | 3.16% | | -- |
| Total Capitalization Rate | | | 9.52% | | 6.36% |
| | | | | | |
| MARKET VALUE | | | $10,399,580 | | $10,753,648 |

---

[26] The ACLI Bulletins reported average interest rates on 36 mortgage loans nationally having a value between $5 million and $14,999 million was 6.17%, with an average length of 11.63 years, and on 19 mortgage loans in the Mid-Atlantic region was 5.79%, with an average length of 7.06 years. Further, the reported range of the loan-to-value ratios were 56.11% - 60.49%. Moreover, as of October 2023, the U.S. 30-year Bond bore a yield of 5.04%.






Interpreter

ADA
Americans with
Disabilities Act

ENSURING
AN OPEN DOOR TO
JUSTICE

| 2023 TAX YEAR | | | | | |
|---|---|---|---|---|---|
| | | **Modified Gross Lease** | | **Net Lease** | |
| | Square feet | Economic rent | Total | Economic rent | Total |
| INCOME | | | | | |
| Ground/first floor | 41,520 | $9.75 P.S.F. | $404,820 | $6.00 | $249,120 |
| 2nd, 3rd, & 4th floors | 122,400 | $7.50 P.S.F. | $918,000 | $4.50 | $550,800 |
| POTENTIAL GROSS INCOME | | | $1,322,820 | | $799,920 |
| LESS: Vacancy & Collection Loss | 5% | | ($66,141) | 5% | ($39,996) |
| EFFECTIVE GROSS INCOME | | | $1,256,679 | | $759,924 |
| | | | | | |
| LESS: Operating Expenses | | PSF or % EGI | | PSF or % EGI | |
| Common Area Maintenance | | $0.15 | $24,588 | -- | -- |
| Insurance | | $0.71 | $116,383 | -- | -- |
| Management fee | | 5% | $62,834 | 5% | $37,996 |
| Leasing commissions | | 3% | $37,700 | 3% | $22,798 |
| Replacement Reserves | | 2% | $25,134 | 2% | $15,198 |
| | | | ($266,639) | | ($75,992) |
| | | | | | |
| NET OPERATING INCOME | | | $990,040 | | $683,932 |
| | | | | | |
| Base Capitalization Rate | | | 6.66% | | 6.66% |
| Effective Tax Rate | | | 2.91% | | -- |
| Total Capitalization Rate | | | 9.57% | | 6.66% |
| | | | | | |
| MARKET VALUE | | | $10,345,246 | | $10,269,249 |

| 2024 TAX YEAR | | | | | |
|---|---|---|---|---|---|
| | | **Modified Gross Lease** | | **Net Lease** | |
| | Square feet | Economic rent | Total | Economic rent | Total |
| INCOME | | | | | |
| Ground/first floor | 41,520 | $9.75 P.S.F. | $404,820 | $6.00 | $249,120 |
| 2nd, 3rd, & 4th floors | 122,400 | $7.50 P.S.F. | $918,000 | $4.50 | $550,800 |
| POTENTIAL GROSS INCOME | | | $1,322,820 | | $799,920 |
| LESS: Vacancy & Collection Loss | 5% | | ($66,141) | 5% | ($39,996) |
| EFFECTIVE GROSS INCOME | | | $1,256,679 | | $759,924 |
| | | | | | |
| LESS: Operating Expenses | | PSF or % EGI | | PSF or % EGI | |
| Common Area Maintenance | | $0.15 | $24,588 | -- | -- |
| Insurance | | $0.71 | $116,383 | -- | -- |
| Management fee | | 5% | $62,834 | 5% | $37,996 |
| Leasing commissions | | 3% | $37,700 | 3% | $22,798 |
| Replacement Reserves | | 2% | $25,134 | 2% | $15,198 |
| | | | ($266,639) | | ($75,992) |
| | | | | | |
| NET OPERATING INCOME | | | $990,040 | | $683,932 |
| | | | | | |
| Base Capitalization Rate | | | 7.13% | | 7.13% |
| Effective Tax Rate | | | 2.61% | | -- |
| Total Capitalization Rate | | | 9.74% | | 7.13% |
| | | | | | |
| MARKET VALUE | | | $10,164,682 | | $9,592,314 |


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



Therefore, the court finds the true or fair market value of the subject property is: (i) $10,500,000, as of the October 1, 2021 valuation date; (ii) $10,300,000, as of the October 1, 2022 valuation date; and (iii) $10,000,000, as of the October 1, 2023 valuation date.

### E. Corrected assessment

Having reached conclusions of the subject property's true or fair market value, the court will turn its attention to determining the correct tax assessment for the subject property for the 2022, 2023, and 2024 tax years.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b).

For the 2022 tax year, the ratio of the total assessed value, $13,783,565 to true market value, $10,500,000 yields a ratio of 131.27%. ($13,783,565/$10,500,000 = 131.27%), which exceeds Paterson's 2022 upper-level limit (78.18%) of the Chapter 123 common level range.[27] Consequently, an adjustment is warranted to the subject property's 2022 tax year assessment. Therefore, the subject property's 2022 tax year assessment calculation is:

$$\$10,500,000 \ \text{x} \ .6798 = \$7,137,900$$

Accordingly, a judgment revising the subject property's 2022 tax year assessment will be

---

[27] Applying plaintiff's proffered 2022 tax year added/omitted assessment of $13,155,565 to the $10,500,000 true market value would have yielded a ratio of 125.29%, which exceeds Paterson's 2022 upper-level limit (78.18%) of the Chapter 123 common level range. Consequently, an adjustment to the subject property's 2022 tax assessment would also have been warranted.






entered as follows:

| Block 6312, Lot 1 | | Block 6312, Lot 2 | |
|---|---|---|---|
| Land: | $ 617,500 | Land: | $ 10,000 |
| Improvement: | $6,377,600 | Improvement: | $132,800 |
| Total: | $6,995,100 | Total: | $142,800 |

For the 2023 tax year, the ratio of the total assessed value, $13,783,565 to true market value, $10,300,000 yields a ratio of 133.82%. ($13,783,565/$10,300,000 = 133.82%), which exceeds Paterson's 2023 upper-level limit (68.25%) of the Chapter 123 common level range. Consequently, an adjustment is warranted to the subject property's 2023 tax year assessment. Therefore, the subject property's 2023 tax year assessment calculation is:

$$\$10,300,000 \ x \ .5935 = \$6,113,100 \ [ROUNDED]$$

Accordingly, a judgment revising the subject property's 2023 tax year assessment will be entered as follows:

| Block 6312, Lot 1 | | Block 6312, Lot 2 | |
|---|---|---|---|
| Land: | $ 617,500 | Land: | $ 10,000 |
| Improvement: | $5,373,300 | Improvement: | $112,300 |
| Total: | $5,990,800 | Total: | $122,300 |

For the 2024 tax year, the ratio of the total assessed value, $13,783,565 to true market value, $10,000,000 yields a ratio of 137.84%. ($13,783,565/$10,000,000 = 137.84%), which exceeds Paterson's 2024 upper-level limit (58.88%) of the Chapter 123 common level range. Consequently, an adjustment is warranted to the subject property's 2024 tax year assessment. Therefore, the subject property's 2024 tax year assessment calculation is:

$$\$10,000,000 \ x \ .5120 = \$5,120,000$$

Accordingly, a judgment revising the subject property's 2024 tax year assessment will be entered as follows:


Interpreter


ADA
Americans with Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



|  | Block 6312, Lot 1 |  | Block 6312, Lot 2 |
|---|---|---|---|
| Land: | $ 617,500 | Land: | $ 10,000 |
| Improvement: | $4,400,100 | Improvement: | $ 92,400 |
| Total: | $5,017,600 | Total: | $102,400 |

Contemporaneously with the issuance of this letter opinion, the court shall enter the above-referenced judgments.

Very truly yours,

/s/ Hon. Joshua D. Novin

Hon. Joshua D. Novin, J.T.C.




